IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: SS BODY ARMOR I, INC., *et al.*, | : | Chapter 11 |
| | : | Bankr. Case No. 10-11255-CSS |
| Debtors. | : | (Jointly Administered) |
| ——————————————————————— | : | |
| | : | |
| D. DAVID COHEN, | : | Civ. No. 15-633-MN |
| Appellant, | : | Civ. No. 15-1154-MN |
| v. | : | |
| | : | |
| SS BODY ARMOR I, INC., *et al.*, | : | |
| | : | |
| Appellee. | : | |
| ——————————————————————— | : | |
| | : | |
| CARTER LEDYARD & MILBURN LLP, | : | Civ. No. 18-349-MN |
| | : | Civ. No. 18-634-MN |
| Appellant, | : | |
| v. | : | |
| | : | |
| SS BODY ARMOR I, INC., *et al.*, | : | |
| | : | |
| Appellee. | : | |

## MEMORANDUM OPINION

Before the Court are related appeals of D. David Cohen ("Cohen") and the law firm of

Carter Ledyard & Milburn LLP ("CLM," and together with Cohen, "Appellants") from several

related decisions entered in the Chapter 11 case of post-confirmation debtor S.S. Body Armor I,

Inc. *f/k/a* Point Blank Solutions, Inc. *f/k/a* DHB Industries, Inc. ("the Debtor" or "the Company").[1]

Cohen, a Point Blank shareholder, has appealed the Bankruptcy Court's July 9, 2015 Order

(B.D.I. 3109) ("Settlement Order") approving the settlement agreement ("Settlement Agreement")

underlying the Debtor's confirmed plan ("Plan") (Civ. No. 15-633-MN) ("Settlement Appeal").

Cohen has also appealed the Bankruptcy Court's December 3, 2015 Orders (i) granting Cohen a

---

[1]     The docket of the Chapter 11 cases, captioned *In re S.S. Body Armor I, Inc.*, Case No. 10-11255-CSS (Bankr. D. Del.), is cited herein as "B.D.I. __."

fee award for his work in preserving a claim under section 304 of the Sarbanes-Oxley Act ("SOX"), 15 U.S.C. § 7243 ("§ 304"),[2] to be paid in the event that funds are received on account of the SOX § 304 Claim, and in an amount to be determined by the Bankruptcy Court (B.D.I. 3624) ("Cohen Fee Order") (Civ. No. 15-1154-MN), and (ii) approving the payment of fees to counsel appointed in a consolidated derivative action against certain of the Company's officers and directors in the amount of $300,000 (B.D.I. 3623) ("Derivative Counsel Fee Order") (together, "the Fee Appeals"). CLM has also appealed (i) the Bankruptcy Court's February 23, 2018 Order (B.D.I. 4049) ("Fee Reserve Order") granting, in part, CLM's motion to establish a $25 million fee reserve (Civ. No. 18-349-MN) ("Fee Reserve Appeal"), and (ii) the Bankruptcy Court's April 24, 2018 Order (B.D.I. 4100) ("First Stay Order") denying CLM's motion to stay all distributions of funds that the Debtor has received or will receive under a global settlement between the Debtor, the trust established pursuant to the Debtor's confirmed plan ("Recovery

---

[2]    The statute generally provides that, if a public company is required to restate its financial reports because of misconduct, the CEO and CFO must reimburse the company for all bonuses, incentive-based compensation, and trading profits they received which are attributable to the restatement period. *See* 15 U.S.C. § 7243. That section of the statute provides in full:

(a) Additional compensation prior to noncompliance with Commission financial reporting requirements
>   If an issuer is required to prepare an accounting restatement due to the material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for—
>>   (1) any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12–month period following the first public issuance or filing with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement; and
>>   (2) any profits realized from the sale of securities of the issuer during that 12–month period.
(b) Commission exemption authority
The Commission may exempt any person from the application of subsection (a) of this section, as it deems necessary and appropriate.

Trust," and together with the Debtor, "Appellees"), the Department of Justice ("DOJ"), a class of plaintiff shareholders in a pre-petition securities class action ("Class Plaintiffs"), and the family of the Debtor's former (and now deceased) CEO, David H. Brooks ("Brooks") (Civ. No. 18-634-MN) ("First Stay Appeal"). For the reasons set forth below, the Court affirms the Settlement Order, the Cohen Fee Order, the Derivative Counsel Fee Order, the Fee Reserve Order, and the First Stay Order.

## I.  BACKGROUND[3]

### A.  Pre-Petition Litigation and EDNY Stipulation

In the fall of 2005, DHB Industries, Inc.'s ("DHB") stock plummeted following revelations that the body armor manufactured by the company contained an inferior material prone to rapid deterioration. Numerous derivative and class action lawsuits were subsequently filed against DHB and its former officers and directors, including Brooks. In January 2006, prior to the commencement of the Chapter 11 cases, the United States District Court for the Eastern District of New York ("EDNY Court") consolidated the derivative and class actions as follows: (1) a consolidated securities class action filed on behalf of purchasers of Point Blank's publicly traded securities against Point Blank and certain of its officers and directors, including Brooks, *In re DHB Industries, Inc. Class Action Litigation*, Civ. No. 05-4296 (JS) ("the Class Action"); and (2) a consolidated derivative action filed on behalf of Point Blank against certain of its officers and directors, including Brooks, for (among other things) breach of fiduciary duty, gross

---

[3]  The appendix to Appellants' opening brief in the Settlement Appeal and Fee Awards Appeal (Civ. No. 15-633-MN, D.I. 28) is cited herein as "A__," and the appendix to Appellees' answering brief (*id.*, D.I. 34) is cited herein as "B__." The appendix to Appellants' opening brief in the Fee Reserve Appeal and First Stay Order Appeal (Civ. No. 18-349-MN, D.I. 13) is cited herein as "AA__," and the appendix to Appellees' answering brief (*id.*, D.I. 15) is cited herein as "BB__."

mismanagement, and waste of corporate assets, *In re DHB Industries, Inc. Derivative Litigation*, Civ. No. 05-4345 (JS) ("the Derivative Action").

In 2006, the parties to the Class Action and Derivative Action entered into a settlement ("EDNY Stipulation"). The monetary terms of the EDNY Stipulation were as follows: the Class Action would be settled for $34,900,000 in cash, plus 3,184,713 shares of Point Blank common stock; and the Derivative Action would be settled through Point Blank's adoption of certain corporate governance policies and a payment of $300,000 for the fees and expenses of counsel appointed in the Derivative Action ("Derivative Counsel"). (B.D.I. 2865). The cash portions of the settlements, in the total combined amount of $35,200,000, were placed in escrow with Class Counsel in 2006 ("the Escrowed Funds"). (*Id.* ¶¶ 2.1-2.2). Additionally, the EDNY Stipulation contained a provision in which the Company agreed to release Brooks from any liability arising under the Sarbanes-Oxley Act and indemnify him from any liability he may incur under § 304. Cohen, a shareholder, opted out of the Class Action but intervened in the Derivative Action to object to the EDNY Stipulation – specifically, to the SOX § 304 indemnification provisions and the payment of $300,000 fees and expenses to Derivative Counsel.

On October 1, 2007, prior to the approval of the EDNY Stipulation, the Company filed restated financial reports for 2003, 2004, and the first quarter of 2005. On October 25, 2007, the SEC brought a civil action against Brooks in the Southern District of Florida seeking disgorgement of the bonuses and trading profits Brooks received during the restatement period ("the SOX § 304 Claim"). *See SEC v. Brooks*, Case No. 07-61526-cv, 2017 WL 3315137 (S.D. Fla. Aug. 3, 2017) ("the SEC Action"). The Complaint alleged that Brooks' trading profits totaled approximately $186 million. *See Cohen*, 622 F.3d at 192. On October 24, 2007, Brooks was indicted in the EDNY on various charges of fraud, insider trading, and other related offenses. *See United States v. Schlegel, et al.,* Case No. 06-cr-00550 (E.D.N.Y.) ("the Criminal Action"). The SEC Action

was administratively closed pending the outcome of Criminal Action against Brooks. *See Cohen*, 622 F.3d at 192, n.6 (citing *Brooks*, Case No. 07-61526-cv, D.I. 16 (Dec. 12, 2007)).

On July 8, 2008, the EDNY Court approved the EDNY Stipulation over Cohen's objections, and entered judgments in the Class and Derivative Actions. (B.D.I. 2941, Ex. D; B.D.I. 3030, Ex. 10). The EDNY Court subsequently entered an order denying Cohen's application for attorneys' fees and expenses and approving provisional payment of Derivative Counsel's fees in the discounted amount of $300,000 over Cohen's objection. Derivative Counsel's fee award was provisionally paid in 2008 following entry of judgment in the Derivative Action. Cohen appealed those rulings to the Second Circuit. With respect to the SOX § 304 issue, the DOJ and SEC supported his appeal as amicus curiae.[4]

In 2010, the U.S. Attorney's Office for the Eastern District of New York ("USAO") commenced a civil forfeiture proceeding ("the Civil Forfeiture Proceeding")[5] against a multitude of Brooks-related assets. Approximately $168 million of cash and non-cash assets were restrained in connection with the Civil Forfeiture Proceeding. Brooks' ex-wife and family, individually and/or on behalf of various entities, filed verified claims to approximately $85 million of the restrained assets.[6] The Debtor and Class Plaintiffs each submitted petitions for remission to the DOJ requesting that the Attorney General use the restrained assets to compensate the Debtor and Class Plaintiffs (respectively) for the losses suffered as a result of Brooks' misconduct. The Attorney General is authorized by statute to use assets forfeited in a civil forfeiture proceeding to

---

[4]     *See* Brief of the United States as Amicus Curiae, 2009 WL 7755913 (2d Cir. Jul. 20, 2009).

[5]     The Civil Forfeiture Proceeding is captioned as *United States v. All Assets Listed on Schedule I Attached Hereto and All Proceeds Traceable Thereto*, Case No. 10-cv-04750 (E.D.N.Y.).

[6]     *See* Civil Forfeiture Proceeding at D.I. 171, 177-179, 181-185,187-192, 195.

compensate victims[7] and "is authorized to decide petitions for remission or mitigation."[8]  As amended, the Debtor's final petition requested remission of approximately $87.7 million, and the Class Plaintiffs' final petition requested remission of approximately $81.5 million.

On April 14, 2010, the Debtor filed its Chapter 11 bankruptcy case.  On September 14, 2010, after an 8-month jury trial, Brooks was convicted of securities fraud, wire fraud, insider trading, and material misstatements to auditors.  The EDNY Court recognized in its criminal restitution order:

> In 2003, Defendants [David Brooks and his co-defendants] began a number of schemes to reap millions in personal profit at the expense of the Company and its shareholders.  The sheer number and diversity of these fraudulent schemes strains belief.  It is no stretch to say that Defendants ransacked that Company for their own gain, and their conduct was devastating to both the Company and its shareholders.

*See* Criminal Action, D.I. 1869 at 4-5.[9]

On September 30, 2010, the Second Circuit issued a decision vacating and remanding the judgment in the Derivative Action on the grounds that the EDNY Stipulation impermissibly released and indemnified Brooks against liability under SOX § 304.  *Cohen v. Viray*, 622 F.3d 188, 195-96 (2d Cir. 2010).   The Second Circuit noted that Cohen's appeal had raised "novel issues of law."  *Id.* at 193.   The Second Circuit further stated:

> Because we conclude that the indemnification and release provisions of the Settlement violate § 304 of the Sarbanes-Oxley Act, 15 U.S.C. § 7243, we do not reach the question of whether the Settlement is substantively and procedurally fair, reasonable, and adequate.  Nor do we reach the issues pertaining to attorneys' fees.  The district court will need to reexamine those issues in any event, either in the context of a revised settlement or the outcome of further litigation.

---

[7]     18 U.S.C. § 981(d).

[8]     *See* 28 C.F.R. Part 9-121.100 (U.S. Attorney's Manual).

[9]     In 2013, Brooks was sentenced to 17 years' imprisonment.

*Id.* at 196. Cohen's appeal and the Second Circuit's decision established a significant precedent.[10]

### B.     Post-Petition Settlement Order and Plan Confirmation

Following the Second Circuit's reversal of the judgment approving the EDNY Stipulation, Debtor, Class Plaintiffs, Class Counsel, and Derivative Counsel (collectively, "Settling Parties") engaged in settlement negotiations with Brooks and his family members. According to Debtor, those negotiations sought to resolve: (1) the Class and Derivative Actions in the EDNY Court, (2) related litigation, claims, and appeals in this Court and the Bankruptcy Court, and (3) competing claims asserted by Point Blank and the Class Plaintiffs to approximately $180 million of assets restrained in connection with the Criminal Action against Brooks in the EDNY Court. Over 2 ½ years, the parties worked to finalize a global settlement with Brooks. In late 2013, Brooks advised the parties that he was no longer interested in pursuing a global settlement.

In November 2014, the Settling Parties executed a term sheet underlying a proposed global settlement. On February 6, 2015, the first iteration of the settlement agreement was executed (A88-108) (as later amended, "the Settlement Agreement").[11] The Settlement Agreement was supported by both the Creditors' Committee and the Equity Committee. The Settlement Agreement provided for the dismissal of the Class Action and Derivative Action (A128 ¶ 6), and the release of the Escrowed Funds to the Class Plaintiffs, Class Counsel, and Derivative Counsel, as contemplated under the EDNY Stipulation (A121 ¶ 2(a); A129 ¶ 8). It further provided that, of

---

[10]     *See, e.g.*, Mark Hamblett, *Circuit Rejects Pact's 'End-Run' Around Liability for Ex-Executives*, NEW YORK LAW JOURNAL, Oct. 1, 2010; Mike Cherney, *2nd Circ. Throws Out DHB Shareholder Settlement*, LAW360 (Sept. 30, 2010); Melissa Maleske, *Executives Can't Negotiate Away SOX Clawbacks*, INSIDE COUNSEL (Jan. 1, 2011).

[11]     An amendment was executed on May 4, 2015 to address the March 27, 2015 Order issued in Criminal Action which ordered Brooks to pay restitution of $53,912,545.62 to the Debtor, and $37,584,301.30 to investor victims. (*See* A118-37). An addendum was executed on June 10, 2015. (*See* A138-43).

the Escrowed Funds released to the Class Plaintiffs, $20 million would be loaned to Point Blank on an interest-free, non-recourse basis to fund the Plan and permit the Debtor to exit Chapter 11. (A121-22 ¶¶ 2(b)-(d)).  It further provided that $1.5 million of the amount loaned would be paid as an administrative expense to Class Counsel and Lowenstein Sandler LLP, as bankruptcy counsel to the Class Plaintiffs (A129 ¶ 8).  Finally, the Settlement Agreement provided for the dismissal of various litigation matters and appeals pending among the Settling Parties in this Court and the Bankruptcy Court (A128 ¶ 6), and for the allocation of future litigation recoveries between the Class Plaintiffs and Debtor, including any recoveries received in connection with the Criminal Action (A138-39).

On February 6, 2015, Debtor moved for approval of the Settlement Agreement in the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 9019.  On June 4, 2015, the hearing on the Settlement Agreement commenced; it continued on June 12, 2015; and concluded on July 6, 2015.[12]  Cohen objected to various fee-related provisions of the Settlement Agreement. In particular, Cohen objected to the $1.5 million payment (from the loan proceeds) to Class Counsel, and to the $300,000 payment (paid in 2008 from the Escrowed Funds) to Derivative Counsel.  Cohen also argued that Point Blank should have been required to seek approval of the Settlement Agreement from the EDNY Court.  The Bankruptcy Court overruled the objection to Class Counsel's fees and approved them as part of the Settlement Agreement.  On July 9, 2015, the Bankruptcy Court entered the Settlement Order approving the Settlement Agreement.  The Bankruptcy Court set a separate deadline for submissions regarding the remaining fee disputes and a November 10, 2015 hearing date on same, so that fee disputes could be heard at the same time

---

[12]    On the record at the July 6, 2015 hearing, the parties to the settlement specified that, if the Bankruptcy Court approved the Settlement Agreement, Debtor would ask the EDNY Court to dismiss the Derivative Action, while the Class Plaintiffs would ask the EDNY Court to approve the Settlement Agreement in the Class Action.  (*See* A167-72; B49-54; B58-59).

as the plan confirmation hearing.  (A182-85, 7/6/15 Hr'g Tr. at 156:14-15).  On July 22, 2015, Cohen appealed the Settlement Order.  (Civ. No. 15-633-MN, D.I. 1).[13]

Following entry of the Settlement Order, on July 10, 2015, Debtor moved the EDNY Court to dismiss the Derivative Action with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2).  On August 18, 2015, the motion was heard together with the Class Plaintiffs' motion for approval of the Settlement Agreement in the Class Action.  Cohen argued that the EDNY Court could not dismiss the Derivative Action (or approve the settlement in the Class Action) without ruling on Cohen's fee issues in the Derivative Action.  These arguments were rejected.  On August 18, 2015, the EDNY Court entered orders approving the Settlement Agreement in the Class Action and dismissing the Derivative Action.  Cohen appealed, and both orders were upheld by the Second Circuit.[14]  November 10, 2015, an order confirming the plan (B.D.I. 3261) ("Plan") was entered following the hearing on Cohen's Fee Claim (discussed below).  (B.D.I. 3526).

---

[13]  Following Brooks' death, the Settlement Order appeal was stayed based on the possibility that the criminal restitution awards entered against Brooks in the EDNY Court would abate.  (Civ. No. 15-633-MN, D.I. 44, 45, 46).  On January 19, 2018, the stay was continued through April 20, 2018 to allow the Debtor time to finalize a global settlement agreement (discussed below).  (Id. at 53, 54).  On May 3, 2018, the stay of the Settlement Order Appeal was lifted, based on the Debtor's representation that the global settlement would be finalized within 2 to 3 months.  (See id., D.I. 55).

[14]  On August 18, 2015, the EDNY Court rejected Cohen's arguments and approved the Settlement Agreement in the Class Action.  See In re DHB Industries, Inc. Class Action Litigation, Civ. No. 05-4296 (JS) (E.D.N.Y.), D.I. 457.  The Second Circuit dismissed Cohen's related appeal for lack of standing because he "opted out of the class and is not a party to the settlement" and "has not stated a plausible interest affected by the judgment." See In re DHB Industries, Inc. Class Action Litigation, Case No. 15-2935 (2d Cir. Feb. 19, 2016), D.I. 71.  On August 18, 2015, the EDNY Court also granted Debtor's motion to dismiss the Derivative Action with prejudice.  Cohen appealed.  See In re DHB Industries, Inc. Derivative Litigation, Civ. No. 05-4345 (JS), EDNY D.I. 274.  The Second Circuit affirmed the EDNY Court's dismissal of the Derivative Action.  Cohen v. Huston, et al., 2016 WL 4059543 at *1-2 (2d Cir. July 29, 2016).  The panel held that (1) it had issued no mandate that the EDNY Court was required to decide Cohen's fee issues, (2) as a nonparty to the Settlement Agreement, Cohen had no standing to claim that the EDNY Court had misread it, (3) any prejudice to Cohen from the dismissal of the Derivative Action was irrelevant under Federal Rule of Civil Procedure 41(a)(2), and (4) even if relevant, any

## C. Cohen Fee Order

Cohen and CLM's joint application sought the immediate payment of $1.86 million ("the Fee Claim") on account of their work in the Derivative Action.[15]  (B.D.I. 3300; BB31-78). Appellants claimed to have incurred actual fees and expenses of $1,509,213.42 ($1,388,556.66 of fees and $120,656.76 of expenses).  (B.D.I. 3300 at 31; BB56).  In support of the Fee Claim, Appellants cited a litany of common fund cases awarding fees and expenses to successful objectors in class action settlements.  (B.D.I. 3300 at 23-25).  Under the common fund doctrine, "a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others have a claim, is entitled to recover from the fund the costs of his litigation, including attorney's fees."  *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 187 (3d Cir. 2005) (internal citations omitted).  Appellants argued that their successful appeal in the Derivative Action eliminated the SOX indemnification provision thereby preserving for the bankruptcy estate the benefit of a $186 million SOX § 304 Claim in the SEC Action, and Appellants' $1.86 million Fee Claim represented only 1% of that claim.  (*See id*. at 27).  As the SEC Action was stayed, and any recovery on the SOX § 304 Claim uncertain, Appellants further argued that objectors to settlements are entitled to fees and expenses, not just where their objections result in an increase to the common fund, but also where their objection "otherwise provides benefits;" here, Appellants argued that their successful appeal was important as a matter of public policy.  (*See id*. at 25).  Appellants

---

prejudice was obviated by Cohen's opportunity to present his fee issues to the Bankruptcy Court.  *Id*. at *1 ("Even assuming Rule 41(a)(2) required us to consider prejudice to Cohen, the District Court did not abuse its discretion in concluding that Cohen's opportunity for a fee hearing under Second Circuit precedent in the bankruptcy court – a hearing he ultimately received and in which he prevailed – sufficiently obviated any prejudice resulting from dismissal.")  The Second Circuit concluded: "We have considered all of Cohen's arguments and find them to be without merit."  *Id*. at *2.

[15]    The Fee Claim amended two claims previously filed by Cohen and CLM in the bankruptcy case in 2010 and 2012.

argued in the alternative that they had a right to fees as a "substantial contribution" award under § 503(b)(3) of the Bankruptcy Code.

Debtor objected to the Fee Claim (B.D.I. 3367) on multiple bases. Debtor argued that the common fund theory was inapplicable because the $186 million asset Appellants claimed to have preserved is a litigation claim controlled exclusively by the SEC, the pursuit of which was uncertain and may never generate funds for the estate. According to Debtor, it was firmly established under case law that, to recover fees from a common fund, an attorney must first create a common fund, and until there is an actual recovery on the basis of the SOX § 304 Claim, fees cannot be awarded on that basis. Debtor further disputed the amount asserted in the Fee Claim, arguing that nearly 60% of the $1.5 million fees and expenses Appellants claimed were not incurred in objecting to the EDNY Stipulation or the Second Circuit appeal. (*See* B.D.I. 3367 at 4, ¶ 4; 16, ¶¶ 35-36). Finally, Debtor argued that, to be entitled to a substantial contribution award under the Bankruptcy Code, Appellants must demonstrate that they made a "substantial contribution in a case under chapter . . . 11." 11 U.S.C. § 503(b)(3). Here, Debtor argued, Appellants' expenses were incurred in prosecuting an appeal that was commenced in July 2008 – over a year and a half prior to the commencement of the Chapter 11 case. Debtor further argued that Cohen's "wasteful litigation tactics throughout the Chapter 11 cases," including taking "meritless positions" in the Bankruptcy Court and this Court – "have hindered the administration of the estates and required the needless expenditure by the estates of considerable fees." (*See id*. at 27; BB80). Accordingly, Debtor argued, Appellants cannot show any substantial contribution to the bankruptcy case after it was commenced. (*Id*.).

Following a November 10, 2015 hearing on the Fee Claim, the Bankruptcy Court found that:

> Mr. Cohen and his counsel are entitled to a fee based on their preservation of the Sarbanes-Oxley claim of approximately $186 million. However,

since no funds have been received by the debtors in connection with that claim, I am not going to determine at this time the proper amount of that claim or order that the claim be paid. If and when the debtors receive funds that are derived from a Sarbanes-Oxley award, I will entertain an application at that time for a fee. And the only issue will be the proper amount of that fee.

(A275-76). The Bankruptcy Court entered a corresponding order that provided:

> Cohen and CLM are awarded a fee for their efforts in preserving the SOX 304 Claim, in an amount to be determined by this Court, with such award to be paid solely from funds received by the Debtors or their successors-in-interest on account of the SOX 304 Claim, if any. For the avoidance of doubt, if the Debtors do not receive any funds on account of the SOX 304 Claim, no fee shall be payable;
>
> . . . within seven (7) days of receipt by the Debtors or their successors-in-interest of any funds on account of the SOX 304 Claim, the Debtors or their successors-in-interest shall notify Cohen and CLM in writing of the receipt of funds;
>
> . . . this Court will retain jurisdiction to consider and rule on the Application at such time as the Debtors or their successors-in-interest have received funds on account of the SOX 304 Claim, at which time the only matter for consideration will be the amount of the fee to be awarded to Cohen and CLM.

(B.D.I. 3624; A283-85).

## D. Derivative Counsel Fee Order

In a separate dispute, Appellants had objected to the $300,000 payment to Derivative Counsel. The relief agreed to in the original settlement of the Derivative Action, three and a half years before the petition date, included various corporate governance reforms and the resignation of Brooks and other officers. (B.D.I. 2865, Ex. B ¶¶ 2.12-2.16). In the EDNY Stipulation, Derivative Counsel agreed to a significant discount of its fees, accepting a total of $300,000 for compensation and expenses. (B.D.I. 3371, Ex. B at 8). That fee award was approved by the EDNY Court, over Cohen's objection, and was provisionally paid from the Escrowed Funds in 2008 pursuant to the EDNY Stipulation. The post-petition Settlement Agreement permitted Derivative Counsel to retain the $300,000 paid provisionally eight years prior, without compensation for any

fees or expenses incurred on appeal or thereafter. Cohen argued that Derivative Counsel should not be paid for negotiating a settlement that ultimately was disapproved by the Second Circuit. The Bankruptcy Court overruled Cohen's Fee Objection, finding in part that Derivative Counsel's compensation was reasonable for services that benefited Debtor by imposing the required corporate governance reforms, however short-lived they turned out to be. (A276; B.D.I. 3623).

On December 15, 2015, Cohen filed a single notice of appeal with respect to both the Cohen Fee Order and the Derivative Counsel Fee Order. (*See* B.D.I. 3672).[16]

### E. Post-Confirmation Global Settlement and SOX § 304 Claim

The SEC Action was stayed for a total of eight years pending the outcome of Criminal Action against Brooks and resulting appeals. *SEC v. Jeffrey Brooks*, Case No. 07-61526-CIV (S.D. Fla). In October 2016, Brooks died in prison. The stay of the SEC Action was lifted in January 2017, and the SEC's motion to dismiss all affirmative defenses to the SOX § 304 Claim was granted.

In May 2017, the Second Circuit heard oral argument and subsequently ruled that the criminal restitution awards against Brooks, upon which the 2015 Settlement Agreement and Plan were predicated, were abated by his death, leading the Debtor to seek to renegotiate a settlement. In December 2017, Debtor, SEC, DOJ, and the Brooks estate, among others, entered into a term sheet for a global settlement ("Global Settlement"). The Global Settlement would resolve multiple claims, including the SOX § 304 Claim, and provides that: (i) the USAO (on behalf of the DOJ and United States), Debtor, Recovery Trust, Class Plaintiffs, and Brooks family will execute a final global settlement agreement ("Global Settlement Agreement"); (ii) the parties to the Global

---

[16] The Fee Appeals were initially stayed to allow time for, among other things, the appointment of a personal representative for Brooks' estate following his death. (*See* Civ. No. 15-633-MN, D.I. 4). The stay was subsequently extended to allow time for the Debtor to finalize a global settlement (as defined below). (*Id.* at D.I. 46, 49). On May 3, 2018, the stay was lifted by the Court in accordance with filed status reports. (*Id.* at D.I. 55).

Settlement Agreement will agree to the civil forfeiture of approximately $142 million of the assets restrained in the Civil Forfeiture Proceeding; (iii) the forfeited amount will first be used to pay the costs and expenses incurred by the United States in the Civil Forfeiture Proceeding and Criminal Action; and (iv) the remainder of the forfeited amount will be distributed pro rata by the DOJ to the Debtor and Class Plaintiffs in accordance with the Approval Letters.[17]

Debtor asserts that it will receive only $70 million under the Global Settlement, while the other approximately $70 million will be distributed to Class Plaintiffs in accordance with the 2015 Settlement Agreement and Plan. Debtor further asserts that the SEC is not party to the Global Settlement, and that the Debtor will receive no recovery on account of the SOX § 304 Claim. "Once the global settlement agreement is executed by the USAO, Debtor, Recovery Trust, Class Plaintiffs, and the Brooks family, the SEC, and the Brooks estate will enter into a consensual final judgment to resolve the SEC Action, which judgment will be deemed satisfied by entry of the forfeiture order in the Civil Forfeiture Proceeding." (Civ. No. 18-349-MN, D.I. 14 at 16-17). Debtor asserts, therefore, that "[n]o funds will be paid to the Debtor or the SEC (or to any other party) as a result of the consensual final judgment in the SEC Action." (*Id.*)

On March 19, 2018, the SEC filed a status report ("SEC Status Report") stating: "The Commissioners have now considered and contingently approved the [Brooks] Estate's settlement offer, which provides, in pertinent part, for the following relief: . . . (2) the Estate shall reimburse SS Body Armor I, Inc. f/k/a Point Blank Solutions, Inc. f/k/a DHB Industries Inc. ('DHB' or the 'Company') $142,000,000 for bonuses and profits David Brooks received from DHB stock sales,

---

[17]    On or about July 11, 2018, the DOJ issued remission approval letters, advising that (i) the Debtor's petition for remission had been approved in the approximate amount of $78.8 million, and (ii) Class Plaintiffs' petition for remission had been approved in the approximate amount of $81.5 million. (*See* BB2, BB6 ("Approval Letters"). Because the approved remission amounts exceed the total amount to be forfeited in the Civil Forfeiture Proceeding – which is the only source of funding for the Global Settlement – the Debtor and Class Plaintiffs will receive pro rata distributions. (*See id.*)

pursuant to Section 304(a) of the Sarbanes-Oxley Act . . ." (emphasis supplied). (A181-82). Appellant took the position that the $142 million recovery is "on account of" the SOX § 304 Claim as required by the Cohen Fee Order.

### F. Fee Reserve Order

On January 17, 2018, CLM moved to establish a $25 million fee reserve pending finalization of the Global Settlement and CLM's submission of an appropriate fee application based on that settlement (B.D.I. 4019) ("Fee Reserve Motion"), and on February 16, 2018, a hearing was held on the Fee Reserve Motion (*see* B.D.I. 4046). The Bankruptcy Court recognized that, absent a stay, all non-reserved funds from the settlement will be distributed "as quickly as possible" to creditors and to holders of equity claims. (*See* A151:20-24). On February 23, 2018, the Bankruptcy Court granted the motion in part, establishing a fee reserve in the amount of $5 million. (*See* A154:3-7; B.D.I. 4049). On March 2, 2018, CLM appealed the Fee Reserve Order. (Civ. No. 18-348-MN, D.I. 1).

### G. First Stay Order, Second Stay Order, and Pending Third Circuit Appeal

CLM then moved for a stay of distributions pending its appeal of the Fee Reserve Order. On April 24, 2018, the Bankruptcy Court entered the First Stay Order, denying CLM's request for stay of distributions, and CLM appealed. (Civ. No. 18-634, D.I. 1). CLM then moved this Court for a stay of distributions pending its appeal of the Reserve Order – essentially seeking the same relief as that sought in its appeal of the Bankruptcy Court's First Stay Order. On June 29, 2018, this Court denied CLM's motion for stay pending appeal. (Civ. No. 18-634, D.I. 15). CLM appealed this Court's denial to the Third Circuit. *See Carter Ledyard & Milburn LLP v. SS Body Armor I, Inc., et al.,* No. 18-2558 (3d Cir.). CLM's appeal remains pending.

## II.    JURISDICTION AND STANDARDS OF REVIEW

The Court has jurisdiction to hear an appeal from a final judgment of the Bankruptcy Court pursuant to 28 U.S.C. § 158(a)(1).  On appeal from an order issued by the Bankruptcy Court, a district court "review[s] the Bankruptcy Court's factual findings under a clearly erroneous standard and exercise[s] plenary review over legal issues."  *In re Trans World Airlines, Inc*., 145 F.3d 124, 130 (3d Cir. 1998).

A bankruptcy court's approval of a settlement is reviewed for abuse of discretion.  *In re Nutraquest, Inc*., 434 F.3d 639, 644 (3d Cir. 2006).  Likewise, a bankruptcy court's fee award is reviewed for abuse of discretion. *Zolfo, Cooper & Co. v. Sunbeam-Oster Co*., 50 F.3d 253, 257 (3d Cir. 1995); *Krueger Assocs., Inc. v. Am. Dist. Telegraph Co. of Penn*., 247 F.3d 61, 69 (3d Cir. 2001) (same).  Abuse of discretion "can occur if the judge fails to apply the proper legal standard or to follow proper procedures in making the determination, or bases an award upon findings of fact that are clearly erroneous."  *In re Rite-Aid Corp., Securities Litig.*, 396 F.3d 294 (3d Cir. 2005) (quoting *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 727 (3d Cir. 2001) (internal quotations omitted)).  The same standard applies to the denial of a petition for fees.  *Rite Aid*, 396 F.3d at 299. Only when the denial is based on an application of law is the review plenary.  *McKenna v. City of Philadelphia*, 582 F.3d 447, 460 (3d Cir. 2009).  "[T]he amount of a fee award [in class actions] is within the district court's discretion so long as it employs correct standards and procedures and makes findings of fact not clearly erroneous."  *Sullivan v. DB Invs., Inc*., 667 F.3d 273, 329 (3d Cir. 2011) (en banc) (citations and quotation marks and alterations omitted).

## III.    ANALYSIS

### A.    Settlement Order

Cohen appeals from the Bankruptcy Court's order approving the Settlement Agreement underlying the Plan (Civ. No. 15-633).  (*See* A183-85).  Cohen's primary argument with respect

to his fees – that the EDNY Court was required to approve the Settlement Agreement and adjudicate the fee issues in the Derivative Action and that the Bankruptcy Court lacked jurisdiction to do so – has been rejected by the Second Circuit. *Cohen v. DHB Industries, Inc.*, 2016 WL 4059543, at *2 (2d Cir. July 29, 2016) ("We have considered all of Cohen's arguments and find them to be without merit."). Cohen has conceded this argument in later briefing. (*See* Civ. No. 15-633-MN, D.I. 38 at 1 n.2 (stating "[t]he Second Circuit effectively ruled that the courts of this Circuit are where the fee issues raised by Cohen should be determined.").

Cohen's remaining arguments on appeal of the Settlement Order challenge the Bankruptcy Court's rulings on Cohen's application for payment of his attorneys' fees (addressed below in section III.B) and Cohen's objections to fees paid to the counterparties to the Settlement Agreement or their counsel. According to Debtor, Cohen seeks to unravel the Settlement Agreement (and thus the Plan it funded), not because Cohen challenges the merits of the Settlement Agreement or the outstanding result it allowed Point Blank to achieve, but because Cohen is dissatisfied with his inability to immediately recover attorneys' fees to which he believes he is entitled. The Court has reviewed the papers and agrees that, outside of the jurisdictional argument which has since been resolved by the Second Circuit, Cohen has not articulated any challenge to the merits of the Settlement Agreement outside of the fee disputes.

The Settlement Agreement was approved under Federal Rule of Bankruptcy Procedure 9019 and provided for the payment (or retention of previous payment) for Derivative Counsel and Class Counsel. "To minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy.'" *Martin*, 91 F.3d at 393 (quoting 9 *Collier on Bankruptcy* ¶ 9019.03[1] (15th ed. 1993)). "The decision whether to approve a compromise under [Bankruptcy] Rule 9019 is committed to the sound discretion of the Court." *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1987). In evaluating a proposed settlement, the bankruptcy court must

balance "the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." *Martin*, 91 F.3d at 393. The Third Circuit has recognized four factors that should be considered in striking the appropriate balance: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." In applying the *Martin* factors, the bankruptcy court "need not be convinced that the settlement is the best possible compromise; the Court need only conclude that the settlement falls within the reasonable range of litigation possibilities somewhere above the lowest point in the range of reasonableness." *In re Nortel Networks, Inc.*, 522 B.R. 491, 510 (Bankr. D. Del. 2014) (citations omitted); *In re W.R. Grace & Co.*, 475 B.R. 34, 77-78 (D. Del. 2012) ("In analyzing the compromise or settlement agreement under the *Martin* factors, courts should not have a 'mini-trial' on the merits, but rather it should canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness."). The bankruptcy court considers "all relevant information that will enable it to determine what course of action will be in the best interest of the estate." *In re Key3Media Group, Inc.*, 336 B.R. 87, 92 (Bankr. D. Del. 2005). The bankruptcy court need not, however, "conclusively determine claims subject to a compromise, nor must the court have all of the information necessary to resolve the factual dispute, for by doing so, there would be no need of settlement." *Id.*

There is apparently no dispute that the Settlement Agreement – and specifically the $20 million interest-free loan provided by Class Plaintiffs – was the Debtor's only viable chapter 11 exit strategy (*see* Civ. No. 15-633-MN, D.I. 27 at 37-38) or that the financing cost of the Settlement Agreement ($1.5 million) was preferable to the costs of any outside financing the Debtor could have obtained (estimated at $15 million), which would have in all likelihood eliminated any recovery to Point Blank's shareholders and substantially impaired recovery to its

unsecured creditors. (*See* A121, 6/12/15 Hr'g Tr. at 121:2-21, 122:10-16; A81 ¶ 40 (settlement agreement provides Debtor with "clear exit strategy" and a means of distributing funds to creditors without delay)). As part of the Settlement Agreement, the Settling Parties agreed that $1.5 million of the loan proceeds would be used to pay the post-petition fees and expenses of Class Counsel. The Bankruptcy Court rejected Cohen's argument that the Settlement Agreement benefited only counsel and exercised its discretion to approve the Settlement Agreement under Bankruptcy Rule 9019:

> There is no question at all that this is a good deal for the debtor. There is no question at all that it is a good deal for the debtors' creditors as represented by the Unsecured Creditors' Committee and, as modified, that it's a good deal for the debtors' equity as represented by the Official Committee of Equity Holders. And I find it highly significant that both committees, class counsel and the debtors, all support the settlement.

(B60-61).

### 1. Class Counsel Fees[18]

The Settlement Agreement provided that of the $20 million loaned by Class Plaintiffs to the Debtor to allow it to exit bankruptcy, $1.5 million would be paid to Class Counsel and Bankruptcy Counsel as an administrative expense of the estates. (A129 ¶ 8). Appellants objected to this provision on the basis that the Settlement Agreement was negotiated primarily to serve the interests of Class Counsel. The Bankruptcy Court overruled Appellants' objection, stating that "there was no question that [counsel's] actions on behalf of the class in crafting a settlement that is so advantageous to the estate has provided some value there." (7/6/15 Hr'g Tr. at 151:3-6). The Bankruptcy Court recognized the "high bar" for attorney fee awards under the Bankruptcy Code

---

[18] While no separate notice of appeal was filed with respect to the Class Counsel Fee Award, Appellants have appealed the Settlement Order with respect to the award of fees to Class Counsel as a component of the Settlement Agreement. (*See* Civ. No. 15-633-MN, D.I. 1 (appealing the Settlement Order and "all orders, interlocutory orders, determinations, findings of fact, conclusions of law and evidentiary rulings related to the [Settlement] Order"); *id.*, D.I. 27 at 33-36).

and noted that such an analysis is "not to be taken lightly," but the Bankruptcy Court nevertheless found that it could forego any "substantial contribution analysis" under these circumstances. (7/6/15 Hr'g Tr. at 150:21-151:6).

On appeal, Cohen argues that, contrary to Third Circuit precedent and the applicable Local Rules, the Bankruptcy Court approved this fee provision without reviewing any documentation. (Civ. No. 15-1154, D.I. 19 at 6). Cohen further argues that "some value" falls far short of the "substantial contribution" necessary to warrant an administrative expense fee award. (Civ. No. 15-1154, D.I. 19 at 35 (citing 7/6/15 Hr'g Tr. at 151:3-6)). Cohen argues that the Debtor's CRO had no knowledge of the services performed by counsel or the fair market value of those services. (*Id.* at 17 (citing A145-46, A149-50, 6/12/15 Hr'g Tr. 35:21 36:11, 89:22-90). Conversely, Debtors argue that the Bankruptcy Court did not abuse its discretion in approving the payment of fees to Class Counsel from the amount loaned by the Class Plaintiffs. (Civ. No. 15-1154-MN, D.I. 26 at 41).

The Court agrees that the $1.5 million payment to Class Plaintiffs' counsel, paid from the proceeds of the Class Plaintiffs' $20 million loan that allowed Point Blank to fund its Plan, was well within the Bankruptcy Court's broad discretion under Bankruptcy Rule 9019 and applicable case law. Appellants do not assert that the Settlement Agreement fails the "lowest point in the range of reasonableness" test, nor do Appellants challenge the underlying merits of the Settlement Agreement. Instead, Appellants ask the Court to unwind the Settlement Agreement (and the Plan) solely because the Bankruptcy Court did not require Class Plaintiffs' counsel to submit a fee application in support. Here, the $1.5 million paid to Class Plaintiffs' counsel was paid from the $20 million that the Class Plaintiffs loaned to Point Blank – on an interest-free, non-recourse basis – to fund the Plan and allow Debtor to exit chapter 11. Appellants have submitted no authority to establish that a fee application was required under the very unique circumstances of this case, *i.e.*,

where a debtor's litigation opponent has financed the debtor's chapter 11 exit with a loan made on terms extremely favorable to the debtor and all of its constituencies, with the full support of all of the debtor's constituencies. The Bankruptcy Court has broad discretion to consider "all relevant information that will enable it to determine what course of action will be in the best interest of the estate." *In re Key3Media*, 336 B.R. at 92. The Court finds no abuse of discretion in the Bankruptcy Court's approval of the Class Counsel fees in connection with the entry of the Settlement Order.

### 2. Derivative Counsel Fee Order

In 2006, the law firm of Robbins Umeda & Fink, LLP ("RUF") was appointed by the EDNY Court as counsel in the Derivative Action. RUF represented that it had expended over 1,400 hours prosecuting and settling the Derivative Action over a period of over two years. (B.D.I. 3371, Ex. B at 8). RUF further represented that it had, *inter alia*, investigated suspicious trading, reviewed SEC filings and public information, analyzed claims and applicable law, negotiated and documented the EDNY Stipulation, responded to objections, and responded to shareholder information requests. (*Id.* at 9). The relief agreed to in the EDNY Stipulation, three and a half years before the petition date, included various corporate governance reforms and the resignation of Brooks and other officers – reforms that RUF handled. (B.D.I. 2865, Ex. B ¶¶ 2.12-2.16). In the EDNY Stipulation, RUF agreed to a significant discount of its fees – nearly 50% – accepting a total of $300,000 for compensation and expenses. (B.D.I. 3371, Ex. B at 8). That fee award was approved by the EDNY Court over Cohen's objection, and it was provisionally paid from the Escrowed Funds in 2008 pursuant to the EDNY Stipulation. The Settlement Agreement underlying the Plan and approved by the Bankruptcy Court permitted RUF to retain the $300,000 paid provisionally eight years prior.

In overruling Cohen's objection to this provision, the Bankruptcy Court did not authorize the expenditure of any additional funds by the estate, and Appellants do not appear to argue that

RUF's hours and fees were unreasonable. Rather, Appellants argue that RUF should not be permitted to retain the $300,000 payment because the "only 'benefit' derivative plaintiffs received was the Debtor's adoption of boilerplate corporate governance provisions" that do not justify a fee award. Additionally, Appellants argue, Derivative Counsel should not be compensated because the EDNY Stipulation contained the SOX § 304 indemnification provisions rejected by the Second Circuit which "left the Debtor and its shareholders in a worse position than they would have been in" absent the Derivative Action. (Civ. No. 15-633, D.I. 27 at 38-39). Conversely, the Debtor argues, Derivative Counsel is entitled to compensation notwithstanding subsequent events, *i.e.*, that Debtor's bankruptcy mooted the corporate governance reforms and the Second Circuit disapproved the SOX § 304 indemnification. Debtor asserts that Appellants offer no legal or factual basis from which it could be concluded that reversal of the indemnity provision, or the Debtor's subsequent bankruptcy filing two and a half years later, would preclude compensation. Debtor further argues that Appellants' position, critiquing Derivative Counsel's efforts in hindsight, overlooks the fact that the Settlement Agreement approved by the Bankruptcy Court is the result of extensive negotiations among the Settling Parties, including Derivative Counsel, and allowed Point Blank to achieve an outstanding result in its bankruptcy case – including a potential recovery to equity interest holders – yet Derivative Counsel has not sought any compensation for fees incurred after 2008, on appeal, or on remand. RUF's successor, appellee Robbins Arroyo, raises similar arguments on appeal. (*See* Civ. No. 15-1154-MN, D.I. 28 at 7-17). Robbins Arroyo further argues that even if disgorgement was compelled, "no money would be returned to the Debtors since the payment was funded by insurance and there would be no economic difference in terms of recovery to stakeholders of the Debtors' estate." (*See id.* at 7).

The Court must agree with Appellees. The Second Circuit's remand decision was issued solely in connection with the Derivative Action and addressed the EDNY Stipulation's

indemnification provision and its violation of SOX § 304. While the Second Circuit remanded the Derivative Action, it did not overturn (or even discuss) Derivative Counsel's fees. *See Cohen*, 622 F.3d at 192 ("declining" to address fee issues Cohen raised on appeal). Here, Derivative Counsel provided the Bankruptcy Court with uncontested evidence in support of the services provided and establishing that the $300,000 fee award was highly discounted, representing a near 50% reduction of its fees and expenses. (*See* B.D.I. 3367 at 28). Appellants presented the Bankruptcy Court with no authority establishing that Derivative Counsel's fees should be denied in their entirety simply because the EDNY Stipulation was ultimately disapproved by the Second Circuit. Additionally, Appellants made no effort to establish that the corporate governance reforms negotiated by Derivative Counsel were merely "boilerplate" or that the work required for those reforms does not justify a fee award. The Bankruptcy Court found the award justified on the basis that Derivative Counsel's services – significant corporate governance reforms negotiated by Derivative Counsel as part of the EDNY Stipulation – had provided at least some benefit to the bankruptcy estate. Based on the record before the Court, that finding is not clearly erroneous. The Court finds no abuse of discretion in the Bankruptcy Court's approval of Derivative Counsel's fees in connection with the Settlement Agreement.

**B.      Cohen Fee Order**

Based on the status of the SEC Action, which was stayed at the time, Appellant sought payment of fees incurred in the Derivative Action under various theories. Appellants argued that they were entitled to an award under class action cases awarding fees from a common fund. (*See* BB60-62). Appellants further directed the Bankruptcy Court to cases in which objectors were awarded a fee in class action cases, regardless of the settlement achieved, based on non-economic benefits. (*See* BB62-64). Appellants argued in the alternative that fees should be awarded as a substantial contribution under the Bankruptcy Code. (BB73-75).

The transcript reflects the Bankruptcy Court's finding that "Mr. Cohen and his counsel are entitled to a fee award based on their preservation of the Sarbanes-Oxley claim of approximately $186 million." (B.D.I. 3561 at 199:18-200:2). However, "since no funds have been received by the debtors *in connection with that claim*, I am not going to determine at this time the proper amount of that claim or order that the claim be paid. If and when the debtors receive *funds that are derived from a Sarbanes-Oxley award*, I will entertain an application at that time for a fee. And the only issue would be the proper amount of that fee." (*Id*. (emphasis added)).

In support of their various arguments concerning how the Cohen Fee Order should have been structured, Appellants cite no cases analogous to the facts of this case, involving a global settlement in a bankruptcy case among many parties with valid claims. The issues raised in this appeal boil down to a premature fight over how the Bankruptcy Court may interpret the 2015 Cohen Fee Order – which was entered at a time when it was unclear whether the SEC would even pursue the SOX § 304 Claim – in the context of the Global Settlement negotiated in 2018. Underlying these appeals is (i) Appellants' contention that the language of the Cohen Fee Order is inconsistent with case law requiring a "common fund" and limits the relief available to Appellants; and (ii) Appellees' contention that Appellants are entitled to no Fee Award because Appellants' efforts have not created – or contributed, in any amount, to – a common fund. As set forth below, the Court disagrees with both contentions and finds no error or abuse of discretion in the Bankruptcy Court's careful decisions to date.

### 1. Common Fund Cases

The Fee Claim sought an award of legal fees based on the common fund doctrine, which is applicable in class actions. In a common fund suit, attorneys' fees come out of the amount of damages awarded to the class. *See In re Trans Union Privacy Litig*., 629 F.3d 741, 743 (3d Cir.

2001). However, Appellants' successful appeal was with respect to the pre-petition non-monetary settlement in the Derivative Action.

"In assessing attorneys' fees, courts typically employ either the percentage of recovery method or the lodestar method." *Rite-Aid,* 96 F.3d at 300. "In the lodestar method, the court multiplies the number of hours that lead counsel reasonably worked by the reasonable hourly rate for that work to determine the counsel's lodestar, which may be multiplied by a factor intended to compensate the attorneys for the risks they faced and any other special circumstances." *Cendant*, 404 F.3d at 188. "The lodestar method is more typically applied in statutory fee-shifting cases because it allows courts to 'reward counsel for undertaking socially beneficial litigation in cases where the expected relief has a small enough monetary value that a percentage-of-recovery method would provide inadequate compensation' or in cases where the nature of the recovery does not allow the determination of the settlement's value required for application of the percentage-of-recovery method." *Rite-Aid*, 396 F.3d at 300 (citing *Prudential Ins. Co. Amer. Sales Practice Litig.*, 148 F.3d 283, 333 (3d Cir. 1998)).

"The second method, now dominant in common fund cases, is the percentage-of-recovery approach." *Cendant*, 404 F.3d at 188. "Under this method, counsel are awarded a fee that is a percentage of the class's total recovery." *Id.* The method inquires whether that percentage is appropriate based on the circumstances of the case. *In re Cendant Corp. Litig.*, 264 F.3d 201, 220 (3d Cir. 2001). In making that determination, the court applies the seven-factor test set out in *Gunter*:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficacy of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of non-payment; (6) the amount of time devoted to the case by plaintiff's counsel; and (7) the awards in similar cases.

*Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000). The Third Circuit has urged a "'lodestar cross-check' to ensure that the percentage approach does not lead to a fee that represents an extraordinary lodestar multiple." *Cendant,* 404 F.3d at 188 (citing *Cendant PRIDES,* 243 F.3d at 742); *Cendant*, 264 F.3d at 285 (noting several cases in which the Third Circuit has recommended "that district courts compare the results at which they arrive via the percentage-of-recovery method with an abbreviated calculation of the lodestar amount. The goal of this practice is to ensure that the proposed fee award does not result in counsel being paid a rate vastly in excess of what any lawyer could reasonable charge per hour, thus avoiding a 'windfall' to lead counsel.")) Both of these approaches have been subject to significant criticism. *See Cendant,* 404 F.3d at 188 (noting same).

A deferential standard of review is applied to fee determinations. However, the Third Circuit does require that trial courts clearly set forth their reasoning for fee awards so that there will be a sufficient basis to review it for abuse of discretion. *Prudential*, 148 F.3d at 340; *Rite-Aid*, 396 F.3d at 302 ("we remind the trial courts to engage in robust assessments of the fee award reasonableness factors when evaluating a fee request.")

### 2. Common Fund Requirement and Contingency

The Cohen Fee Order provides that Appellants were "awarded a fee award for their efforts in preserving the SOX § 304 Claim to be paid solely from funds received by the Debtors or their successors-in-interest on account of the SOX 304 claim." (B.D.I. 3624). Appellants argue on appeal that the Bankruptcy Court erred in (1) granting the Cohen Fee Order on a contingent basis and (2) only in the event that the SOX § 304 Claim itself creates a common fund. Appellants argue that "[t]he Bankruptcy Court made payment of Cohen's fee award contingent because it believed Cohen's efforts did not create a "common fund" and that "[t]his is not the law relating to

26

compensation of objectors" as objectors do not need to create a common fund. (Civ. No. 15-633-MN, D.I. 27 at 29-31).

First, Appellants certainly relied on common fund cases in support of their Fee Claim (B66-60-62) and continue to assert that a common fund has been created by virtue of their efforts in appealing the EDNY Stipulation and preserving the SOX § 304 Claim. (*See* BB68 (arguing that "[i]t is undisputed that Cohen's actions resulted in a potential $186 million common fund asset"; Civ. No. 15-633-MN, D.I. 27 at 37 ("Cohen's efforts unquestionably preserved a $186 million asset, or viewed another way eliminated a $186 million liability for the Debtor.")). Setting aside Appellants' own assertions, while the term "common fund" is mentioned in transcripts, the Cohen Fee Order does not require that Appellants create a common fund solely from the outcome of the SOX § 304 Claim or use any language that would foreclose relief under the circumstances of the Global Settlement.

In the transcript of the November 10, 2015 hearing on the Fee Claim and Plan Confirmation, the Bankruptcy Court discusses the SOX § 304 Claim and indicates that whatever fee award is allowed to Appellants, it will be paid out of "that fund:"

> Mr. Cohen and his counsel are entitled to a fee based on their preservation of the Sarbanes-Oxley claim of approximately $186 million. However, since no funds have been received by the debtors in connection with that claim, I am not going to determine at this time the proper amount of that claim or order that the claim be paid. If and when the debtors receive funds that are derived from a Sarbanes-Oxley award, I will entertain an application at that time for a fee. And the only issue would be the proper amount of that fee. I'm not – it could be one percent, it could be higher. I'm not deciding today what an appropriate percentage is. I'm not deciding what an appropriate lode star is. That's completely reserved. *And whatever I allow the debtor will pay out of that fund*. And I'm going to specifically reserve jurisdiction to make that decision.

(B.D.I. 3561, 199:18-200:7) (emphasis added). And in considering Appellants' request for a $25 million fee reserve, the Bankruptcy Court considered whether "to set a reserve to ensure there

are funds available to pay [CLM] or the Court to ultimately determine that a common fund has been created." (B.D.I. 4046 at 49:15). The Bankruptcy Court was clear, however, that its ruling did not consider whether a common fund has been created or not, nor did it consider "whatever that award should be in the event that a common fund has been created." (*Id*. at 49:22-50:1). And in the same hearing, the Bankruptcy Court later indicates that some portion of the Global Settlement may be attributable to the SOX § 304 Claim, but that an evidentiary hearing will be required to make that determination:

> From what I've heard from the podium from the attorneys is that it's going to be really, really difficult to figure out what part of this global complicated settlement is attributable to the 304 action. That's going to require I think an evidentiary hearing in the future and it's going to require the Court to do its best to make a hard decision, a hard factual finding as to what effect, if any – or what piece, if any, of that settlement is applicable to the 304 action – the settlement of the 304 claim. That's not for today, that's for the future. The money needs to come in, *we need to have a hearing on what portion of that money is attributable to a 304 claim, and if any is attributable to a 304 claim what the fee should be for [CLM] in connection with the services they did to create that common fund.*

(*Id*. at 50:2-17) (emphasis added). The Court finds no basis for Appellants' contention that the Bankruptcy Court required Appellants to create a common fund solely from the SOX § 304 Claim. The Bankruptcy Court has merely required that some funds be received on account of – or derived from, or attributable to – the SOX § 304 Claim. (*See id*. at 199:20-22 (deferring determination of Cohen's fee award because "no funds have been received by the debtors *in connection with* [the SOX § 304] claim.") (emphasis added)).

The case law is clear that no particular method is required for consideration and calculation of a fee award in these circumstances. The Third Circuit does not mandate a particular method but requires that the court awarding a fee engage in a "robust assessment" of the fee award reasonableness so that the reviewing court will have a sufficient basis to review if for abuse of discretion. *Id*. at 302. The Cohen Fee Order does not mandate or foreclose a particular method.

Indeed, the Bankruptcy Court has clearly reserved its ruling on what method or methods it will employ in making that determination. (B.D.I. 3561, 199:18-200:7). This is consistent with case law requiring that the Bankruptcy Court consider all of the circumstances of the case in determining reasonableness of fees. *See Cendant*, 264 F.3d at 220. The percentage-of-recovery method may be appropriate here, as was mentioned during the proceedings. (*See* B.D.I. 3561, 199:18-200:7 ("[I]t could be one percent, it could be higher. I'm not deciding today what an appropriate percentage is."). However, the lodestar method may allow the Bankruptcy Court to reward Appellants for undertaking "socially beneficial litigation" in a case similar to those where "the nature of the recovery does not allow the determination of the settlement's value required for application of the percentage-of-recovery method." *See Rite-Aid*, 396 F.3d at 300. Appellants argue that, "[b]ecause the global settlement resolves multiple claims, the Fee Order, unless corrected, will predictably require years of additional costly and wasteful litigation over the role of the SOX 304 claim in the $142 million global settlement." (Civ. No. 18-349-MN, D.I. 12 at 2). The Court disagrees with this assessment. Additionally, an examiner may be appointed to recommend an appropriate amount under the Cohen Fee Order.

As is common in the bankruptcy context, various parties have apparently reached a Global Settlement regarding multiple claims and proceedings. Accordingly, as the Bankruptcy Court acknowledged, it appears that there may be no clear or quantifiable traceable recovery on account of ***any*** one of the claims against the restrained assets, including the SOX § 304 Claim. However, the language of the Cohen Fee Order does not foreclose Appellants' ability to recover a Fee Award in these circumstances. Ultimately, a determination of whether the Debtor has or will receive at least some recovery on account of the SOX § 304 Claim – or derived from the SOX § 304 Claim

– in the context of the Global Settlement will be determined by the Bankruptcy Court and is not a ruling on appeal before this Court.[19]

Nor did the Bankruptcy Court abuse its discretion in granting the Cohen Fee Order on a contingent basis; rather, the Bankruptcy Court's ruling is consistent with Third Circuit guidance on fee requests, including whether the award "is appropriate based on the circumstances of the case." *See Cendant*, 264 F.3d at 220. The Cohen Fee Order was entered in bankruptcy proceedings and at a time when it was unclear whether the SEC would even bring the SOX § 304 Claim, let alone whether there would be a recovery. The SOX § 304 Claim was stayed for years pending the outcome of other litigation. A determination of the appropriate amount of the Cohen Fee Award could not be made by the Bankruptcy Court in a vacuum, where any recovery on the SOX § 304

---

[19]    The Court notes that the parties have taken extreme and likely untenable positions on this issue. Appellants argue that the Debtors will receive $142 million "on account" of the SOX § 304 Claim, despite the fact that many valid and competing claims are resolved in the Global Settlement. Appellants' assertion that the restrained assets will come into the estate solely on account of the preserved SOX § 304 claim is supported only by a description contained in the SEC Status Report characterizing the settlement and is unavailing. Debtor's position that "no funds" will be received on account of the SOX § 304 Claim is similarly unavailing. It is based solely on the structure of Settlement Agreement, pursuant to which the Brooks estate has agreed to "be held liable" to the SEC on its disgorgement claims in the total amount of $142 million, and to "reimburse" $142 million to the Debtor pursuant to SOX § 304, such that all monetary obligations of the Brooks estate will be "deemed satisfied" by forfeiture of the restrained assets in the civil forfeiture proceeding. (A182). Having structured the settlement in this way, Debtor contends that "the Brooks estate isn't paying $142 million to anyone – not the SEC and certainly not the Debtor." (*Id*. at 8-9). "The $142 million of restrained assets will be distributed by the DOJ as remission payments to the Debtor and Class Plaintiffs, based on their status as victims of Brooks' misconduct, with an anticipated recovery of approximately $70 million by the Debtor. This distribution of the restrained assets also is discussed in the SEC's status report, which states that the forfeited assets will be 'distributed to shareholder victims and the Company.'" (A182). However, the Court finds little merit in the argument that SOX § 304 Claim played no part in the Global Settlement. SOX is essentially a strict liability statute – if financials are restated, the director is required to return funds received during the restatement period. Here, all affirmative defenses to the SEC Action were denied and the SEC Action was ripe for summary judgment. *See Brooks*, 2017 WL 3315137, at *9. With no intent to foreclose a finding or determination to the contrary, the available record appears to support a finding that the SOX § 304 Claim was among the many claims settled by the Global Settlement which will lead to a recovery by the Debtor.

Claim was ultimately speculative, as Appellants conceded. (*See* B68 (Appellants' efforts resulted in a "potential . . . common fund asset")). The Court finds no abuse of discretion in the Bankruptcy Court's determination to award fees on a contingent basis, essentially reserving judgment on the amount of the award, if any, until the outcome of the SEC Action was known.

### 3. Awards to Objectors

Appellants further argue that the Bankruptcy Court was wrong to rely on cases that deal with awards to lead counsel, not to objectors. Appellants argue that the Second Circuit and Third Circuit have each recognized the important role that objectors play by giving courts access to information on the settlement's merits. *See Bell Atlantic, Eubank, Gen. Motors.* (*See* Civ. No. 15-633-MN, D.I. 27 at 26-27). Appellants argue that a contingent award of fees was contrary to the law in this circuit and the Second Circuit. Appellants argue that objectors to derivative and class actions are entitled to fee awards where their objections improve the settlement or otherwise serve the public interest, thus the Bankruptcy Court's decision to enter the Cohen Fee Order on a contingent basis cannot stand. Appellants argue that there is no doubt that CLM's efforts improved the settlement: "if they had not, the Second Circuit would have affirmed the judgment approving the settlement in 2010." (18-349-MN, D.I. 12 at 2). Conversely, Debtor argues that, unlike this case, in each of the percentage-of-recovery cases cited by Appellants, the objector contributed to an identifiable increase in the settlement and was awarded a percentage of that increase.[20]

---

[20]     *See* Civ. No. 18-348-MN, D.I. 14 at 26, n.9 (citing *McDonough v. Toys "R" Us, Inc.*, 80 F. Supp. 3d 626, 662 (E.D. Pa. 2015) (distribution increased by $15 million, and objector awarded percentage of that amount); *Arnett v. Bank of Am., N.A.*, 2014 U.S. Dist. LEXIS 149679, *9-10 (D. Or. 2014) (objection led to withdrawal of reimbursement request, and objector awarded percentage of withdrawn amount); *Dewey v. Volkswagen of Am.*, 909 F. Supp. 2d 373, 396 (D.N.J. 2012) (objector's work clarified recoveries for sub-class, so court calculated benefit conferred based on value of claims and awarded percentage of that amount); *In re Transpacific Passenger Air Transp. Antitrust Litig.*, 2015 U.S. Dist. LEXIS 106943, *12-14 (N.D. Cal. Aug. 13, 2015) (objection to $1 million of expenses, with award of percentage of that amount); *In re Puerto Rican Cabotage Antitrust Litig.*, 815 F. Supp. 2d 448, 467-468 (D.P.R. 2011) (objection decreased fees by $3 million,

The Court agrees that none of these cases relied upon by Appellants is analogous to the case at bar. The cases cited by Appellants do not concern awards made in the context of a global bankruptcy settlement like the Settlement Agreement at issue here. These cases, while instructive, do not have direct application under these circumstances, where the amount of the Global Settlement that may be derived from the SOX § 304 Claim has not been determined. Unlike those cases, the settlement funds here are the restrained assets, which are – and always were – subject to valid competing claims, including those of the Debtor, Class Plaintiffs, Brooks' family members, and the SEC, pending in multiple jurisdictions. The Court finds no abuse of discretion in the Bankruptcy Court's determination that a percentage-of-recovery award to Appellants, as successful objectors, could not be awarded at this stage of the proceedings and under these circumstances.

### 4. Substantial Contribution Award

Finally, Appellants argue that the Bankruptcy Court erred in failing to award payment of Appellants' fees and expenses on the basis of their substantial contribution to the Debtor's estate pursuant to 11 U.S.C. § 503(b). (*See* 15-633-MN, D.I. 27 at 33-36). Section 503(b) of the Bankruptcy Code provides, in relevant part, for the allowance as an administrative expense of reasonable compensation for attorneys for "a creditor . . . [or] an equity security holder . . . in making a substantial contribution in a case under chapter 9 or 11 of this title." 11 U.S.C. §§ 503(b)(3)(D) and 503(b)(4). The application of the substantial contribution standard was discussed at length by the Third Circuit in *Lebron v. Mechem Fin. Inc.*, 27 F.3d 937 (3d Cir. 1994):

> Subsection 503(b)(3)(D) represents an accommodation between the twin objectives of encouraging "meaningful creditor participation in the reorganization process," [ ] and "keeping fees and administrative expenses

and objector awarded percentage of that amount); *Kaufman v. Am. Express Travel Related* Servs., 2016 U.S. Dist. LEXIS 26167, *44-45 (N.D. Ill. Mar. 2, 2016) (objections contributed to $1.3 million increase in claims, and court awarded percentage of that amount)).

at a minimum so as to preserve as much of the estate as possible for the creditors." . . . Inherent in the term "substantial" is the concept that the benefit received by the estate must be more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests. Creditors are presumed to be acting in their own interests until they satisfy the court that their efforts have transcended self-protection . . . . "[S]ubstantial contribution" should be applied in a manner that excludes reimbursement in connection with activities of creditors and other interested parties which are designed primarily to serve their own interests and which, accordingly, would have been undertaken absent an expectation of reimbursement from the estate.

*Id.* at 944. Cohen argues that he provided a substantial contribution to the estate and its creditors by objecting to, and appealing the approval of, the EDNY Stipulation, and that his work was supported by evidence of the legal fees and expenses he incurred over seven years.[21] According to Cohen, his efforts unquestionably preserved a $186 million asset – or, viewed another way, eliminated a $186 million liability for the Debtor – and the Debtor has admitted that Cohen's appeal resulted in "substantial benefits" to the estate by preventing the EDNY Stipulation from becoming effective. (D.I. 27 at 36-37 (citing A27 ¶¶ 43, 44; A31 ¶ 46)). Thus, Cohen argues, the Bankruptcy Court erred in not granting the Fee Claim on this alternative basis. Conversely, Debtor argues that Cohen was not entitled to a substantial contribution award because under the statute, the expenses must be incurred "in a case under chapter . . . 11."

The Court agrees with the Debtor. Here, the expenses Cohen argues made a substantial contribution were incurred prosecuting an appeal that was commenced in July 2008, over a year and a half before the bankruptcy cases were commenced. Oral argument in the appeal was held on January 15, 2010, four months before the April 14, 2010 petition date. The fees Cohen incurred were for services that were, on their face, "designed primarily to serve [Cohen's] own interests and which, accordingly, would have been undertaken absent an expectation of reimbursement from the estate." *Id.* The Court's conclusion is supported by *Lebron*. In that case, a former officer and

---

[21] *See* B.D.I. 3300-3, 3300-4 (legal invoices attached to Cohen's Fee Claim).

director, James Scott, suspecting fraudulent activity, undertook litigation to appoint a custodian, obtain an accounting of assets, and obtain an injunction against transfers of trust funds. Three days after Scott obtained an order compelling disclosures, the company filed a chapter 11 petition. *Id*. at 940-41. Scott immediately filed a motion for appointment of a trustee, which was granted, and gave the trustee all of the information that he had gathered. The bankruptcy court found that this information "contributed to the [t]rustee's report of investigation filed promptly with [the] Court on April 24, 1990 identifying various assets and summarizing the history of questionable financial transactions between [Mechem] and [Copple and affiliates and corporations under Copple's control.]" *Id*. at 941. The bankruptcy court included in its substantial contribution award certain pre-petition fees that it found were critical to the immediate determination to appoint a trustee. *Id*. at 946. Scott's earlier litigation efforts, however, were *not* reimbursable. *Id*.

> A creditor should be presumed to be acting in his or her own interest unless the court is able to find that his or her actions were designed to benefit others who would foreseeably be interested in the estate. In the absence of such a finding, there can be no award of expenses even though there may have been an incidental benefit to the chapter 11 estate. Here, the bankruptcy court made no such finding. *There was evidence before it tending to show that Scott incurred the reimbursed expense in pursuit of his own interests. He appears to have incurred a substantial portion of that expense, for example, in litigation over control of Mechem initiated many months before a reorganization was anticipated by anyone. If this be true, this expense would not be reimbursable under § 503(b)(3)(D) even if information disclosed in that litigation subsequently turned out to be helpful to the trustee.*

*Id*. at 946 (emphasis added). *Lebron* is clearly analogous. The Court finds no error in the Bankruptcy Court's decision not to grant the Fee Claim on the basis of substantial contribution.

After a careful review of the language of the orders on appeal and transcripts of the underlying bench rulings, the Court further finds no basis to disturb any of the Bankruptcy Court's careful decisions to date, including its decision to approve the Settlement Order or delay ruling on the proper amount of the Cohen Fee Award pending the outcome of the SEC Action.

### C.     Fee Reserve Order[22]

The Bankruptcy Court granted Appellants Fee Reserve Motion in part, setting a fee reserve in the amount of $5 million.  This ruling was based on the papers submitted, the attorneys' fees incurred, and the size of the possible Global Settlement (which had not yet been finalized). (*See* B.D.I. 4046, 2/16/18 Hr'g Tr. at 52-54).  Importantly, the $5 million amount "was not a cap" on recovery (*id*. at 54:4-13), although Appellants argued that any reserve would function as a cap on Appellants' recovery because any funds received under the Global Settlement would otherwise be quickly distributed to creditors and equity.

In appealing the Fee Reserve Award, Appellants argue that "[u]nder the proper standard, CLM is entitled to a substantial fee award, one that is well above the $5 million reserve." (Civ. No. 18-349, D.I. 12 at 2).  Appellants' argument rests on their argument that Debtors will receive $142 million by virtue of the Global Settlement.  The Bankruptcy Court found that Appellants' $25 million reserve request was "problematic" because it was "based on a false premise" that "the estate is receiving 130 plus million dollars."  (*Id*. at 50:6-52:7).  The Bankruptcy Court noted that there is a "sharing agreement in place" between the Debtor and Class Plaintiffs, as set forth in the Plan, whereby "certain funds are split and never come into the estate."  (*Id.* at 51:21-52:7). Additionally, the Global Settlement had not yet been finalized at the time of the Fee Reserve Motion and hearing.  The Court finds no abuse of discretion in the Bankruptcy Court's determination that a higher reserve was not justified under these circumstances.

---

[22]     Debtor raises the additional argument that the appeal of the Fee Reserve Order is moot because the Bankruptcy Court has already granted CLM the relief it requested in its opening brief – a 7% reserve of the amount of the Debtor's anticipated recovery under the Global Settlement."  Debtor argues that, contrary to CLM's assertions regarding the amount to be received under the settlement, Debtor will receive only $70 million under the Global Settlement, and by virtue of the $5 million reserve, CLM has already been granted a fee reserve and received the relief sought.  As previously noted, the amount to be received by the Debtor under the Global Settlement is disputed factual issue, and the Court disagrees that the appeal can be moot on this basis.

Appellants further argue that the Bankruptcy Court "failed to apply the relevant factors and instead relied only on the lodestar analysis." (Civ. No. 18-349, D.I. 12 at 8-9). However, the Bankruptcy Court correctly considered both methodologies in setting the fee reserve. While the Bankruptcy Court considered the lodestar method in ordering the Debtor to establish a $5 million reserve, Judge Sontchi stated that he also "thought about [the reserve] in terms of percentage" and that "an appropriate number to reserve is $5 million." (2/16/18 Hr'g Tr. at 53:2-7). This is consistent with the Third Circuit's suggestion that a court evaluating fees apply a cross-check methodology, and the method for calculating the Cohen Fee Award was specifically reserved by the Bankruptcy Court: "I'm not deciding what an appropriate percentage is. I'm not deciding what an appropriate lode star is. That's completely reserved." (*Id*. at 200:3-6). Appellants' argument regarding the methodology applied by the Bankruptcy Court in setting the Fee Reserve is unpersuasive, and the Court finds no error or abuse of discretion.

### D.     First Stay Order

Appellants' request for a stay of distributions pending appeal of the Fee Reserve Order was denied by the Bankruptcy Court in the First Stay Order. The Bankruptcy Court based its denial on, *inter alia*, "a very low likelihood of success on the merits of the appeal" of the Fee Reserve Order, which had set a "generous" fee reserve in absence of any finalized settlement, and a "very low likelihood of receiving a fee award in excess of $5 million." (*See* B.D.I. 4110, 4/24/18 Hr'g Tr. at 37:10-17; 36:12-14 (noting that "the reality is that we are in bankruptcy, we're talking about a claim, and a [lodestar] on a claim of two to three X is extraordinary, certainly let alone nine X.")). The First Stay Order was subsequently appealed to this Court. However, Appellants subsequently filed an additional request for stay pending appeal in this Court, therefore seeking essentially the same relief as they seek in their appeal of the First Stay Order. On June 29, 2018, this Court entered the Second Stay Order again denying CLM's motion for stay pending appeal.

For the reasons set forth in the Second Stay Order, the Court finds no basis for an abuse of discretion in the Bankruptcy Court's entry of the First Stay Order. As the Second Stay Order is currently on appeal to the Third Circuit, no further analysis is undertaken here.

## IV.    <u>CONCLUSION</u>

The Bankruptcy Court adhered to the framework set forth in controlling case law and the Court finds no abuse of discretion in its decision to make payment of the Cohen Fee Award contingent on the outcome of the SOX § 304 Claim. The Global Settlement will resolve many competing claims, including the SOX § 304 Claim, which likely provided an additional basis for the recovery that the Debtor will obtain. The Bankruptcy Court is in an excellent position to make the determination as to what portion of the recovery may be attributable to, or derived from, the SOX § 304 Claim by virtue of the Global Settlement and what method is best employed to determine an appropriate fee award under the prior Cohen Fee Order, based on the complex litigation history between the parties and unique circumstances of this case. The Court finds no abuse of discretion in the Bankruptcy Court's decision to set a fee reserve in the amount of $5 million based on the status of the Global Settlement and the circumstances of this case. The Orders on appeal do not foreclose the relief sought by Appellants or an award of fees following the execution of the Global Settlement. A separate Order shall be entered.

June 3, 2019

_Maryellen Noreika_
The Honorable Maryellen Noreika
United States District Judge